UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

RODNEY PAUL ROMULD, individually, and consecutively as Co-Special Administrator of the Estate of Lucas Paul Gilbertson, deceased,

Plaintiff,

v.

AEISSO SCHRAGE,

Defendant.

Case No. 24-CV-0409 (PJS/LIB)

ORDER

David C. Thompson, DAVID C. THOMPSON, P.C.; DeWayne A. Johnston, JOHNSTON LAW OFFICE; and Daniel Baczynski, BACZYNSKI LAW OFFICE, PLLC, for plaintiff.

Ashley M. Ramstad and Jason M. Hiveley, IVERSON REUVERS, for defendant.

This case arises from the January 9, 2024, fatal shooting of Lucas Paul Gilbertson by defendant Aeisso Schrage, who, at the time, served as a police sergeant in East Grand Forks, Minnesota, and as commander of a regional drug task force. Gilbertson's father, plaintiff Rodney Paul Romuld, brings this action under 42 U.S.C. § 1983, asserting excessive-force claims against Schrage. This matter is before the Court on Schrage's motion for summary judgment. ECF No. 29. For the reasons that follow, Schrage's motion is granted.

I.  BACKGROUND

In January 2024, Schrage was the commander of the Pine to Prairie Drug and Violent Crime Task Force (the "Task Force")—an investigative unit drawing officers from four cities, eight counties, and one federal agency.  Ramstad Decl. Ex. 4, ECF No. 32-4; *id.* Ex. 2 at 9:15–10:6, ECF No. 32-2 ("Schrage Dep.").[1]  On January 8, 2024, and again on January 9, the Task Force received tips that Gilbertson had been seen on a snowmobile at the home of his mother, Gail Gilbertson.[2]  Schrage Dep. 29:6–30:5; Ramstad Decl. Ex. 1 at 8, ECF No. 32-1 ("Schrage BCA Tr.").  At that time, Gilbertson was the subject of felony arrest warrants in two counties, had forfeited roughly $72,000 in appearance bonds by failing to show up for court appearances, and was facing a possible 20-year prison sentence.  *See* Ramstad Decl. Ex. 5 at 2–3, ECF No. 32-5; *id.* Ex. 7 at 2–4, ECF No. 32-7.[3]

---

[1]The Task Force's primary function is to investigate narcotics offenses and violent crimes in an eight-county area in northwestern Minnesota.  Schrage Dep. 14:1–7; Ramstad Decl. Ex. 1 at 1–2, ECF No. 32-1; *id.* Ex. 3 at 11:8–18, 15:6–16:15, ECF No. 32-3.

[2]To avoid confusion, the Court refers to Lucas Gilbertson by his last name and to his mother, Gail Gilbertson, by her first name.

[3]Romuld argues that the letter from the Polk County Attorney's Office (which is attached as Exhibit 7 to the declaration of Ashley Ramstad) would not be admissible at trial and therefore cannot be considered by the Court.  Pl.'s Resp. at 2–3, ECF No. 44; *see* Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.")  Specifically, Romuld objects that the letter is inadmissible hearsay.  Fed. R. Evid. 802.

(continued...)

Gilbertson was not a stranger to Schrage (or to other members of the Task Force). *See* Schrage BCA Tr. at 3.  In July 2016, Schrage was among a number of officers who tried to apprehend Gilbertson, who was then a suspect in a case involving a stolen firearm.  Ramstad Decl. Ex. 9 at 4–5, ECF No. 32-9; Schrage Dep. 42:4–13.  After a high-speed vehicle chase, Gilbertson ran out of gas, left his truck in a drainage ditch, and fled on foot.  Ramstad Decl. Ex. 9 at 5.  As Gilbertson ran, an empty holster fell from his belt. *Id.*; Schrage Dep. 42:19–21.  A search of Gilbertson's pickup truck turned up a loaded, stolen .22-caliber revolver hidden beneath the center console.  Ramstad Decl. Ex. 9 at 5; Schrage Dep. 42:21–24.  Gilbertson was later convicted of five counts—one for being a felon in possession of a firearm, one for third-degree burglary, one for third-degree driving while impaired, and two for fleeing police in a motor vehicle—and sentenced to 60 months in prison.  Schrage BCA Tr. at 3; Ramstad Decl. Ex. 8 at 1, ECF No. 32-8.

Gilbertson was released from prison in 2021, and he soon began accumulating new charges and new arrest warrants.  *See generally* Ramstad Decl. Exs. 5, 8.  Beginning no later than August 2023, the Task Force had tried on multiple occasions to arrest Gilbertson pursuant to outstanding warrants.  *See, e.g.*, Ramstad Decl. Ex. 10, ECF No.

---

[3](...continued)

The Court disagrees.  The contents of the letter would be admissible at trial because the letter is not being offered for the truth of the matters asserted, but to prove what Schrage *knew* about Gilbertson at the time of the shooting.  *See* Fed. R. Evid. 801(c); *see also Barnes v. Felix*, 605 U.S. 73, 81 (2025) (noting that "past circumstances known to the officer . . . may inform the reasonableness of the use of force").

32-10 (documenting attempted arrest on August 29, 2023); Schrage Dep. 24:7–29:2 (describing several "attempts to apprehend Lucas Gilbertson"); Schrage BCA Tr. at 3–7 (same).  During one attempt in October 2023 at Gilbertson's residence, Gilbertson threw a large piece of furniture down the stairs at the Polk County Sheriff and escaped by jumping out of a second-story window.[4]  *See, e.g.*, Ramstad Decl. Ex. 11 at 9:17–13:10, ECF No. 32-11 ("Holte Dep.").  Throughout the "four or five hour[]" standoff, Gilbertson had "refused to show [officers] his hands" and would not say whether he had a gun.  *Id.* at 12:6–18.  Officers later recovered an empty handgun holster, but they did not find any guns.  *Id.* at 13:11–18; Schrage Dep. 28:12–18.  That November, the Task Force learned from an informant that Gilbertson claimed to have "an AR rifle" and had told others that there was "no way he's going back to prison."  Schrage BCA Tr. at 7; Schrage Dep. 44:12–16.

All of this is to say that, on January 9, 2024, many of the officers on the scene—including Schrage—were very familiar with Gilbertson, his tendency to flee police, his reported possession of firearms (including an AR rifle), and his vow that he would not go back to prison.[5]  *See, e.g.*, Schrage Dep. 37:18 ("[H]e always ran, he always

---

[4]Schrage was not on the scene for the October 2023 attempted arrest, although he was "monitoring it on the phone."  Schrage BCA Tr. at 5; *see also* Schrage Dep. 17:15–18:17.

[5]Romuld does not object to the Court's consideration of these historical circumstances.  Nor could he, as the Supreme Court has directed that the "totality of the

(continued...)

escaped."); Ramstad Decl. Ex. 3 at 30:4–5, 40:15–23, ECF No. 32-3 ("Hedlund Dep.")

(testifying that Gilbertson "was known to flee scenes" and had a "reputation within the

East Grand Forks Police Department"); Baczynski Decl. Ex. 3 at 3, ECF No. 43-3

("Anderson BCA Tr.") ("I know he always flees whenever deal[ing] with law

enforcement.").[6] So, when the Task Force got a tip on January 9, 2024, that Gilbertson

was at his mother's house—and confirmed that the snowmobile was at the house, Holte

Dep. 14:23–15:1—Schrage devised a plan "on the fly" based on his assumption that

Gilbertson would try to escape, Schrage Dep. 40:23, 30:1–15; *see also* Holte Dep. 15:5–9;

Anderson BCA Tr. at 3 (stating that disabling the snowmobile was "our main priority

because we knew that he would flee like normal [] on that snowmobile").[7]

The plan included the following elements:  First, a uniformed deputy would

knock on Gail's front door and ask whether Gilbertson was there, while a second officer

---

[5](...continued)
circumstances" inquiry into the reasonableness of an officer's use of force "has no time
limit."  *Barnes v. Felix*, 605 U.S. 73, 80 (2025); *cf. Liggins v. Cohen*, 971 F.3d 798, 799–801
(8th Cir. 2020) (noting officer's familiarity with the suspects and apartment complex
from past incidents).

[6]When citing exhibits attached to the declaration of Daniel Baczynski, the Court
uses the electronically generated page numbers at the top of the page.

[7]Although the Task Force had been pursuing Gilbertson for months, the plan to
arrest Gilbertson at Gail's house "came about out of nowhere."  Anderson BCA Tr. at 3;
Schrage BCA Tr. at 8 ("The ops plan was the draft that was in the works for
[Gilbertson's] farm[.]  [T]here was not an ops plan for [Gail's] house because it was get
the tip, go get eyes on."); Baczynski Decl. Ex. 1, ECF No. 43-1.

disabled the snowmobile parked behind the house "to eliminate [Gilbertson's] escape off the property." Schrage Dep. 33:8–14, 34:24–35:7. If Gail denied that Gilbertson was there, the uniformed officers would leave—a deliberate "feint" to make it look as though "[w]e tried and we left." *Id.* at 37:23–38:1; *see also id.* at 33:25–34:7 ("The sheriff's office had tried multiple times [to serve a warrant] at that residence, this was going to be just one more of those attempts."). Meanwhile, undercover officers in plain clothes (including Schrage) would establish a perimeter around the house and wait. *Id.* at 34:9–15, 37:2–21; Holte Dep. 21:13–22:19; Schrage BCA Tr. at 9.

At first, the plan fell "perfectly into place." Schrage Dep. 54:9–10. At about 11:40 am, Polk County Deputy Sheriff Kyle Olson approached Gail's front door while East Grand Forks Police Officer John Grabanski removed the key from the snowmobile. Baczynski Decl. Ex. 2 at 4, ECF No. 43-2 ("CFS Log"); Ramstad Decl. Ex. 12 at 20:23–21:4, ECF No. 32-12 ("Grabanski Dep."). Gail answered the door a few minutes later, told Olson that Gilbertson was not there (she was lying), and refused to consent to a search. CFS Log at 4; Ramstad Decl. Ex. 14 at 01:56–02:58, ECF No. 32-14 ("Olson BWC-1"). Eventually, Gail asked Olson to "give [her] five minutes," and closed the door. Olson BWC-1 at 03:09–03:20. When Olson knocked again roughly seven minutes later, Gail responded through the closed door that she was "on the phone with [her] lawyer." *Id.* at 10:40–11:30.

By noon, at least seven officers were on the scene—two in uniform and five in plain clothes. *See* CFS Log at 4; Schrage Dep. 59:25–61:3 (describing each officer's location "before Lucas tried to flee"). Two Task Force officers, Brady Holte and Nick Anderson, were positioned in an unmarked vehicle in a neighbor's driveway with a view of the snowmobile. Holte Dep. 19:5–20:5; Anderson BCA Tr. at 3–4. Schrage, who had been observing with binoculars about a half mile from the house, was finalizing a search warrant so that a SWAT team could enter Gail's house. Schrage BCA Tr. at 11–12; Schrage Dep. 39:2–16, 47:25–48:17; CFS Log at 4.[8] Officers heard some yelling inside the house, but it subsided. Holte Dep. 17:10–13; Schrage Dep. 36:2–15; Ramstad Decl. Ex. 15 at 06:43–06:49, ECF No. 32-15 ("Grabanski BWC") ("I can hear a lot of yelling coming from the back here."); *id.* at 08:53–08:56 ("Quiet in the back now here too.").

Then, as anticipated, Gilbertson ran out of the house at about 12:22 pm and tried to escape on his snowmobile. CFS Log at 4; Holte Dep. 17:15–20. Holte and Anderson ran toward Gilbertson, shouting, "Lucas, Lucas, stop." Holte Dep. 22:22–23:17; Anderson BCA Tr. at 5. Gilbertson looked down, realized the snowmobile keys were missing, and ran back inside the house. Holte Dep. 23:11–21; Anderson BCA Tr. at 5.

---

[8]While waiting for Gilbertson to leave the house, Schrage learned that his request for a SWAT team was denied because Gilbertson's "warrants [were] not for anything but property [crimes] or burglary." Schrage Dep. 39:17–41:22.

At this point, the plan had to "pivot," Holte Dep. 18:11–12, as the Task Force had not anticipated that Gilbertson would "go[] back inside," Schrage Dep. 91:8–14.  Schrage radioed "hot pursuit," CFS Log at 4; Schrage Dep. 54:19–55:1—i.e., Schrage ordered the officers to pursue Gilbertson into the house—but, by the time Holte and Anderson reached the back door, it was locked, Holte Dep. 23:22–25, 28:7–19.  Holte turned the knob while Anderson kicked it open, both yelling commands.  Holte Dep. 23:22–25:1; Ramstad Decl. Ex. 17 at 00:13–00:17, ECF No. 32-16 ("Brault BWC").  Once inside, Holte and Anderson encountered Gail and began trying to coax her out of the house while word passed among the officers that Gilbertson may be armed.  Holte Dep. 24:16–26:5, 33:7–21; Anderson BCA Tr. at 5; Ramstad Decl. Ex. 16 at 00:05–00:57, ECF No. 33 ("Olson BWC-2"); Brault BWC at 01:06–01:08.[9]

Within 20 seconds of Gilbertson's retreat, officers radioed that he was "breaking a window" on the "north side of [the] house."  CFS Log at 4; Brault BWC at 00:21–00:31.  Officers began converging on the north side of the house, while Anderson and Holte ushered Gail toward the back door.  Olson BWC-2 at 00:58–01:25; Brault BWC at 01:20–01:32; Holte Dep. 26:4–27:15, 39:3–13; Grabanski Dep. 33:3–33:12.  Schrage, meanwhile, positioned himself beneath the broken window.  Schrage Dep. 55:2–7.  He

---

[9]Word that Gilbertson was armed apparently did not reach Schrage until he saw it for himself.  Schrage Dep. 64:22–65:5.  Schrage, however, "believe[d] he ha[d] firearms" based on Gilbertson's "history."  Schrage BCA Tr. at 13.

anticipated that Gilbertson "was going to jump out," and then Schrage would Tase him and place him in cuffs. *Id.* at 55:5–9, 111:14–19; Schrage BCA Tr. at 13.

But Gilbertson did not climb out of the window, and Schrage began to hear "some commotion in the bedroom." Schrage Dep. 55:10–18. Believing that his officers had followed Gilbertson into the house, Schrage went to the front door, kicked it open as a diversion, and entered with his Taser drawn. *Id.* at 55:15–56:3, 70:7–71:3, 84:14–21; Schrage BCA Tr. at 13.

Inside, Schrage saw Gail in the kitchen in front of him and a guest, Terry Storbakken, in the living room to his left. Schrage Dep. 56:3–12. Then, to Schrage's right, he heard "the sound of a snowmobile suit rubbing against the wall." *Id.* at 56:13–15. When Schrage turned to the right, he was face-to-face with Gilbertson, who was holding "what look[ed] like a cannon." Specifically, Gilbertson was holding a revolver "up at his rib cage with the barrel pointed at [Schrage], hand on the grip." *Id.* at 56:24–57:3, 107:6–7; *see also* Schrage BCA Tr. at 14. Gilbertson looked at Schrage and said, "[F]uck you, Aeisso." Schrage Dep. 57:5–9; *see also* Schrage BCA Tr. at 14.

Schrage fired his Taser, but Gilbertson had "disappeared" into the bedroom and shut the door. Schrage Dep. 57:11–15; 75:8–11, 86:11–17. The Taser probes "embedded in the wall," and the wires draped over the banister of the staircase perpendicular to the hallway. *Id.* at 69:20–70:3, 57:13–15. Schrage repositioned himself, crossing the front entryway to stand on the other side of the hallway where Gilbertson had disappeared.

*Id.* at 57:21–58:5, 71:9–19, 77:24–78:12.  When Schrage peeked around the corner of the hallway, he saw the bedroom door "fl[y] open."  *Id.* at 72:2–14, 75:8–16.  Gilbertson exited the bedroom and walked "at least halfway down the hallway."  *Id.* at 80:17–22, 101:5–16.  Schrage "gave it a split second to see if [Gilbertson's] hands were in the air," then started shooting.  *Id.* at 76:6–22, 58:6–17.  Schrage's first shot "hit[] the corner of the drywall and just explod[ed] in dust."  *Id.* at 58:11–12.  Schrage kept shooting until Gilbertson turned around and fell to the ground, back inside the bedroom.  *Id.* at 58:13–17.  By Schrage's count, "less than five seconds" had elapsed between when he fired his Taser and when he fired his gun.  Schrage BCA Tr. at 21.

Schrage held Gilbertson at gunpoint while Holte—who had re-entered the house but did not witness the shooting—tried to handcuff him.  Schrage Dep. 58:18–59:6; Holte Dep. 39:24–40:13, 42:8–20.  More officers came running into the house, and Schrage can be heard yelling, "He pulled a gun on me!  Where is it?"  Olson BWC-2 at 03:18–03:20; Brault BWC at 02:39–02:41; *see also* Schrage Dep. 59:7–11, 74:15–75:7; Holte Dep. 40:21–23.

What Schrage had not seen while the bedroom door was closed was that Gilbertson had thrown his gun out of the broken window and into the yard.  Schrage Dep. 74:6, 75:5–7.  Olson can be heard on his body-worn-camera ("BWC") yelling, "He's

throwing stuff out the window!"  Olson BWC-2 at 02:13–02:15.[10]  Schrage fired a total of six shots at Gilbertson, four of which hit him.  *See* Schrage Dep. 95:24–96:3; Baczynski Decl. Ex. 6, ECF No. 43-6; Olson BWC-2 at 02:15–02:20; Brault BWC at 01:35–01:39.  Less than two minutes elapsed between Gilbertson retreating into the house and officers radioing "Shots fired."  CFS Log at 4.  Gilbertson's gun was recovered outside of the house, lying in the snow unfired.  It is undisputed that Gilbertson was not armed at the moment he was shot.  *See* Baczynski Decl. Ex. 5 at 2, ECF No. 43-5.

Gilbertson was transported to the hospital, but he died during surgery.  *See* Baczynski Decl. Ex. 6.  Exactly one month later, Romuld filed this action.  *See generally* Compl., ECF No. 1.  He alleges that Schrage, acting under color of state law, used excessive force when he shot Gilbertson.  *Id.* ¶¶ 1–2, 9.  In September 2024, the Polk County Attorney's Office found that Schrage had acted lawfully in using deadly force and declined to bring criminal charges against him.  *See generally* Ramstad Decl. Ex. 7.

---

[10]Schrage denies hearing any officer "yell that the gun got thrown out the window."  Schrage Dep. 98:12–17; *see also id.* at 79:7–18.

## II.  ANALYSIS

### A.  *Standard of Review*

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute over a fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  And a dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  When considering a summary-judgment motion, the Court views the record in the light most favorable to the nonmoving party and draws all reasonable inferences in his favor.  *Thompson v. Hubbard*, 257 F.3d 896, 898 (8th Cir. 2001).

### B.  *Individual-Capacity § 1983 Claims*

Schrage argues that he is entitled to qualified immunity because his use of deadly force was objectively reasonable under the circumstances.  To determine whether an officer is entitled to qualified immunity in a § 1983 action, a court must ask "(1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct."  *Brown v. City of Golden Valley*, 574 F.3d 491, 496 (8th Cir. 2009).  Courts may address these questions in either order, *Pearson v. Callahan*, 555

-12-

U.S. 223, 226 (2009), but "[t]o deny qualified immunity, the answer to both questions must be yes." *Cravener v. Shuster*, 885 F.3d 1135, 1138 (8th Cir. 2018).

Here, the Court need only address the first question. Excessive-force claims are analyzed "under the Fourth Amendment's objective reasonableness standard." *Hassan v. City of Minneapolis*, 489 F.3d 914, 919 (8th Cir. 2007); *see also Marks v. Bauer*, 166 F.4th 1121, 1129 (8th Cir. 2026) ("There is no separate 'reasonableness' test for when deadly force is used.").[11] The question is whether Schrage's actions were "'objectively reasonable' in light of the facts and circumstances confronting [him], without regard to [his] underlying intent or motivation," and without the "20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396–97 (1989).

The Court has carefully reviewed the record, including recordings from multiple BWCs, deposition testimony, and interviews conducted by the Minnesota Bureau of Criminal Apprehension ("BCA") in the days following the shooting. *See Barnes v. Felix*, 605 U.S. 73, 80 (2025) (noting that there "is no 'easy-to-apply' legal test" for

---

[11]Romuld also brings excessive-force claims under the Eighth and Fourteenth Amendments. *See* Compl. ¶¶ 1, 40–51. But "the Eighth Amendment applies only to convicted prisoners," and "the Fourteenth Amendment does not apply to excessive force claims involving arrests, which are appropriately reviewed under a Fourth Amendment analysis." *Jackson v. Stair*, 944 F.3d 704, 709 (8th Cir. 2019) (first citing *Hott v. Hennepin Cnty.*, 260 F.3d 901, 905 (8th Cir. 2001); and then citing *Graham v. Connor*, 490 U.S. 386, 394–95 (1989)). Because "*all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest . . . should be analyzed under the Fourth Amendment and its 'reasonableness' standard," Romuld's Eighth and Fourteenth Amendment claims are dismissed. *Graham*, 490 U.S. at 395.

reasonableness and instructing courts to "'slosh [their] way through' a 'factbound morass'") (quoting *Scott v. Harris*, 550 U.S. 372, 383 (2007)). Based on the admissible evidence in the record, the Court finds that the following facts are not genuinely disputed:

(1)     On January 9, 2024, Gilbertson was the subject of multiple felony arrest warrants and faced a lengthy prison sentence. Schrage was aware of these facts.

(2)     Schrage also knew that Gilbertson had a long history of evading arrest, that an empty handgun holster (but no gun) had been found at his home, and that he claimed to possess an AR rifle. Schrage further knew that Gilbertson had vowed that there was "no way he's going back to prison."

(3)     Roughly 40 minutes after a uniformed deputy knocked on Gail's front door, Gilbertson attempted to escape on the snowmobile that he had parked behind the house.

(4)     Finding the snowmobile key missing, Gilbertson retreated inside the house while undercover officers shouted commands at him to stop.

(5)     Back inside the house, Gilbertson broke a window in a bedroom in the northeast corner of the house. Officers radioed, "Breaking window." Brault BWC at 00:21–00:23; CFS Log at 4.

(6)     After Gilbertson broke the window, Schrage kicked in the front door and encountered Gilbertson in the front hallway.

(7)     Gilbertson was holding a gun "up at his rib cage with the barrel pointed at [Schrage], hand on the grip."

-14-

> Schrage Dep. 106:24–107:7.  Schrage thus knew that Gilbertson was armed.
>
> (8)    Schrage attempted to deploy his Taser, but the prongs missed and struck a wall.
>
> (9)    Gilbertson ran into the bedroom with the broken window, shut the door, and threw the gun out of the window.  The BWCs recorded Olson outside yelling, "He's throwing stuff out the window!"  Olson BWC-2 at 02:13–02:15.  Schrage denies hearing this, Schrage Dep. 98:12–17, and his denial is almost surely true given that (as the body-cam recordings establish) Schrage fired the first shot before Olson had even finished his sentence.  Olson BWC-2 at 02:13–02:15.
>
> (10)   Moments after throwing his gun out the window, Gilbertson emerged from the bedroom and approached Schrage.  Schrage fired six shots because he believed Gilbertson was armed, and he could not see Gilbertson's hands.

Under the Constitution, "[t]he use of deadly force is reasonable where an officer has probable cause to believe that a suspect poses a threat of serious physical harm to the officer or others." *Loch v. City of Litchfield*, 689 F.3d 961, 965 (8th Cir. 2012).  This is true "[e]ven if a suspect is ultimately found to be unarmed," *id.* at 966 (quotation omitted), because "[a]n act taken based on a mistaken perception or belief, if objectively reasonable, does not violate the Fourth Amendment," *Krueger v. Fuhr*, 991 F.2d 435, 439 (8th Cir. 1993).

Without question, the circumstances here justified the use of force.  Although this case centers on Schrage's "split-second judgment[]," *Graham*, 490 U.S. at 397, the facts

-15-

that informed that judgment had been accumulating for months (if not years).  *See Barnes*, 605 U.S. at 82 ("A court deciding a use-of-force case cannot review the totality of the circumstances if it has put on chronological blinders.").  On January 9, 2024, Schrage knew that Gilbertson (1) had several outstanding warrants and was facing a long prison sentence; (2) had a long history of fleeing police, and, three months earlier, had assaulted an officer who tried to arrest him; (3) kept an empty handgun holster in his home; and (4) had vowed that "there was no way he's going back to prison."  *See, e.g.*, Schrage BCA Tr. at 6–7, 9; Schrage Dep. 40:19–24, 41:16–22, 43:18–45:11, 64:22–65:5; Ramstad Decl. Ex. 7 at 3–4; *see also Barnes*, 605 U.S. at 80–81 ("The history of the interaction, as well as other past circumstances known to the officer, thus may inform the reasonableness of the use of force.").

The reasonableness of Schrage's response is only bolstered by what happened during the seconds that "matter[] most."  *Barnes*, 605 U.S. at 80 ("Of course, the situation at the precise time of the shooting will often be what matters most.").  In the seconds leading up to the shooting, Gilbertson pointed a gun directly at Schrage, disappeared behind a closed bedroom door, and—moments later—opened the door and came at Schrage with his hands out of view.  Under these circumstances, "[a]n officer is not constitutionally required to wait until he sets eyes upon the weapon before employing deadly force to protect himself."  *Hubbard*, 257 F.3d at 899.  In *Hubbard*, the Eighth Circuit upheld the use of deadly force against a *fleeing* suspect who only *appeared* to be

-16-

reaching for a weapon. *Id.* at 898–99.  Here, Gilbertson did not merely *appear* to reach for a weapon.  Just moments earlier, Gilbertson had pointed a gun directly at Schrage, and, when Schrage fired, Gilbertson was *advancing toward him*—not fleeing from him.  If the officer's use of force in *Hubbard* was justified, then so was Schrage's.

In short, the Court finds, based on the undisputed facts in the record, that Schrage's use of force against Gilbertson was reasonable as a matter of law.  The Fourth Amendment does not ask whether Schrage acted perfectly.  It asks only whether a reasonable officer in Schrage's position—knowing what Schrage knew and seeing what Schrage saw—could reasonably have believed that deadly force was necessary.  *See Graham*, 490 U.S. at 396–97.  The answer is "yes."

Romuld disagrees, of course, and suggests three reasons why Schrage's summary-judgment motion should be denied.  The Court now turns to those arguments.

### 1.  Schrage's Knowledge

Romuld first argues that a reasonable jury could conclude that Schrage knew that Gilbertson was unarmed when Schrage discharged his weapon, and that such a conclusion would mean that Schrage's use of force was not reasonable.  Pl.'s Resp. at 3, 11, ECF No. 44.  In support of his argument, Romuld notes that Storbakken—who was on the other side of the house—told the BCA that he "thought [he] heard somebody yelling from the outside [']gun on the ground['] or something."  Baczynski Decl. Ex. 4

-17-

at 19, ECF No. 43-4 ("Storbakken BCA Tr.").  According to Romuld, if Storbakken heard this "on the other side of the house," then Schrage must have heard this as well, as Schrage was closer to the broken window.  Pl.'s Resp. at 11.

Romuld has not offered evidence to create a *genuine* dispute of fact.  A party cannot defeat summary judgment on "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position."  *Liberty Lobby*, 477 U.S. at 252.  And where a party's account is "blatantly contradicted by the record, so that no reasonable jury could believe it," the Court must accept the facts as established by the record.  *Scott*, 550 U.S. at 380.  Here, the *only* statement captured on *any* BWC is Olson yelling that Gilbertson was throwing "*stuff* out of the window"—and Schrage's first shot can be heard before that sentence even ended.  Olson BWC-2 at 02:13–02:15.  None of the BWCs recorded anyone referring to a "gun" being thrown out the window.  Moreover, Storbakken's account to the BCA was equivocal:  He said he "*thought* [he] heard . . . [']gun on the ground['] *or something*" but that he did not "remember exactly."  Storbakken BCA Tr. at 19 (emphasis added).  This is not evidence that Schrage heard any of the yelling—much less that Schrage heard that Gilbertson had thrown a gun out the window—much less that Schrage knew Gilbertson was unarmed (after all, Gilbertson could have had multiple weapons, including the AR rifle he had claimed to possess).  Romuld cannot "stave off summary judgment 'armed with only the hope that the jury might disbelieve

-18-

[Schrage].'" *Hubbard*, 257 F.3d at 899 (quoting *Gardner v. Buerger*, 82 F.3d 248, 252 (8th Cir. 1996)).

Romuld cites *Williams v. City of Burlington*, 27 F.4th 1346 (8th Cir. 2022), but the case does not help him. There, the court found that there was a genuine dispute about whether an officer actually saw the suspect drop his gun as he fled from police. *See id.* at 1349. Moreover, the plaintiff offered police reports and BWC recordings that showed the officer "appear[ing] to look directly at the items dropped by [the suspect]— including the gun—while running after him" and showed that the suspect "was nearly prone on the ground when he was fatally shot." *Id.* at 1351. The facts in *Williams* are nothing like the facts in this case. Even under Romuld's version of the facts, Gilbertson threw his gun through a window while Gilbertson was behind a closed door and out of Schrage's sight. Likewise, at the time he was shot, Gilbertson was advancing toward Schrage, not running away from him.

Moreover, even if Romuld could manufacture a *genuine* dispute, it would not be *material*. *See* Fed. R. Civ. P. 56(a). The Eighth Circuit is clear that "[a]n act taken based on a mistaken perception or belief" will not violate the Fourth Amendment if the mistake was "objectively reasonable." *Krueger*, 991 F.2d at 439. For example, in *Loch*, the Eighth Circuit held that an officer reasonably employed deadly force even after witnesses on the scene told the officer that the suspect was unarmed. 689 F.3d at 966–67. Here, Schrage was "in no position" to verify whether Gilbertson was still

armed when, just a few seconds earlier, Gilbertson had pointed a revolver at Schrage, Gilbertson was coming at Schrage, and Schrage could not see Gilbertson's hands. *Id.* at 967. And again, even if an officer had yelled that a gun had been thrown through the window, and even if Schrage had heard that statement, Schrage could not have known whether Gilbertson was unarmed, as Gilbertson could have possessed two weapons and thrown one out the window as a diversion. Just as in *Loch*, this case "present[s] the type of 'tense, uncertain, and rapidly evolving' situation requiring 'split-second judgments' that [courts] are hesitant to second-guess with the benefit of hindsight." *Id.* at 966–67 (quoting *Graham*, 490 U.S. at 396–97).

### 2. Warrantless Entry

Romuld also argues that Schrage's warrantless entry into Gail's home was a separate Fourth Amendment violation, and that this unlawful entry precipitated the confrontation that led to the shooting. *See* Pl.'s Resp. at 8–9. In everything but name, Romuld is asking the Court to apply the so-called "provocation rule" created by the Ninth Circuit in *Billington v. Smith*, 292 F.3d 1177 (9th Cir. 2002), and later abrogated by a unanimous United States Supreme Court in *County of Los Angeles v. Mendez*, 581 U.S. 420 (2017). As this Court previously explained:

> Under the *Billington* rule, a law-enforcement officer can be
> found liable for using force against a suspect—even if that
> use of force was reasonable under the circumstances—if,
> *before* using that force, the officer violated the suspect's
> Fourth Amendment rights, and the Fourth Amendment

-20-

> violation led to the need to use force. So, for example, if a police officer unlawfully barges into a suspect's home in the middle of the night, the suspect responds by shooting at the police officer, and the police officer returns fire, the police officer could be held liable for shooting the suspect (even if the use of deadly force was justified by the fact that the suspect was shooting at the officer) because the officer's unlawful entry precipitated the exchange of gunfire.

*Quiñones v. City of Edina*, No. 20-CV-1329 (PJS/BRT), 2022 WL 2954028, at *7 (D. Minn. July 26, 2022), *aff'd*, 77 F.4th 1192 (8th Cir. 2023).

Even if the *Billington* rule were still good law in the Ninth Circuit—and even if Minnesota were in the Ninth Circuit—the provocation rule would not help Romuld because there is no evidence that any officer violated *Gilbertson's* constitutional rights before Schrage used deadly force against him. The Fourth Amendment's "protections are personal and cannot be asserted by persons lacking a 'legitimate expectation of privacy' in the place searched." *United States v. Kuenstler*, 325 F.3d 1015, 1020 (8th Cir. 2003) (quoting *Rakas v. Illinois*, 439 U.S. 128, 143 (1978)). As Romuld's complaint itself acknowledges, Gilbertson was a *visitor* in Gail's home, Compl. ¶ 10, and it is black-letter law that "a visitor usually lacks a rightful expectation of privacy when present in the home of another," *United States v. Sturgis*, 238 F.3d 956, 958 (8th Cir. 2001); *see also* Ramstad Decl. Ex. 6 at 9:1–20, ECF No. 32-6 ("Gail Dep.") (confirming that Gilbertson "ha[d] his own house" and was not living with her). Thus, if the entry into Gail's home was unlawful, the rights violated were Gail's, not Gilbertson's.

-21-

In any event, the provocation rule is not good law, and it has never been the law of the Eighth Circuit (as *Billington* itself recognized). *Billington*, 292 F.3d at 1187. Although *Mendez* reserved the question of when courts may "tak[e] into account unreasonable police conduct prior to the use of force that foreseeably created the need to use it," the Supreme Court was unequivocal that "once a use of force is deemed reasonable under *Graham*, it may not be found unreasonable by reference to some separate constitutional violation." *Mendez*, 581 U.S. at 429 n.* (emphasis omitted); *see also Barnes*, 605 U.S. at 83–84 (declining to consider "whether or how an officer's own creation of a dangerous situation factors into the reasonableness analysis") (quotation omitted). Moreover, the Eighth Circuit has already rejected the argument that *Mendez* and *Barnes* declined to reach—that an officer acts unreasonably if his own tactics "created the danger" that made the use of force necessary. *See Liggins v. Cohen*, 971 F.3d 798, 799–801 (8th Cir. 2020) (concluding that officers investigating a stolen firearm who "anticipated that a subject might flee" and "position[ed] themselves in a way that faciliatate[d] apprehension of [the] subject" did not act unreasonably or "create the danger" that led to the use of force).

### 3. Animus

Finally, Romuld points to evidence of personal animosity between Schrage and Gilbertson that, in Romuld's view, is relevant to whether Schrage acted reasonably in shooting Gilbertson. Romuld first points to Schrage's statement to the BCA two days after the shooting in which Schrage volunteered that although he and Gilbertson went to high school together, they "weren't friends." Schrage BCA Tr. at 3 ("[Gilbertson] knew me from school, we weren't friends, we were acquaintances[.]"). Second, Romuld himself testified that for a "solid[] year and a half" before his death, Gilbertson would insist that Schrage was "going to kill me, dad, he's out to fricking kill me." Ramstad Decl. Ex. 18 at 10:10–11:9, ECF No. 32-18 ("Romuld Dep."); *see also* Gail Dep. 24:20–21 ("Aeisso Schrage told me he was going to kill my son."). Third, Romuld offered a tardy affidavit from an individual who claimed that Schrage told him in August 2023 that "Lucas Gilbertson keeps getting away from me" and that Schrage "would rather not have to shoot Lucas." Neuerburg Aff. ¶ 4, ECF No. 47-1.

None of this alters the Court's conclusion. Excessive-force claims are analyzed under the Fourth Amendment's "reasonableness" standard. *See Brown*, 574 F.3d at 496 (citation omitted). The test is whether the force was objectively reasonable from the perspective of a reasonable officer on the scene. *Id.* That issue is determined "without regard to [the officer's] underlying intent or motivation." *Graham*, 490 U.S. at 397; *see also id.* at 399 n. 12 ("The Fourth Amendment inquiry is one of 'objective reasonableness'

under the circumstances, and subjective concepts like 'malice' and 'sadism' have no proper place in that inquiry."). Accordingly, any personal animosity that Schrage held toward Gilbertson cannot "make a Fourth Amendment violation out of an objectively reasonable use of force." *Id.* at 397.

### C. Monell *Claims*

To the extent that Romuld also asserts claims against Schrage in his official capacity, *see* Compl. ¶¶ 8–9, those claims are, in fact, *Monell* claims against the City of East Grand Forks, *see Elder-Keep v. Aksamit*, 460 F.3d 979, 986 (8th Cir. 2006) ("A suit against a public official in his official capacity is actually a suit against the entity for which the official is an agent."); *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 694 (1978). "Official-capacity liability under 42 U.S.C. § 1983 occurs only when a constitutional injury is caused by 'a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy.'" *Grayson v. Ross*, 454 F.3d 802, 810–11 (8th Cir. 2006) (quoting *Monell*, 436 U.S. at 694). To succeed on a *Monell* claim, then, Romuld must identify an unconstitutional policy or custom, and he must prove that the unconstitutional policy or custom *caused* a deprivation of Gilbertson's constitutional rights. *See, e.g., Malone v. Hinman*, 847 F.3d 949, 955 (8th Cir. 2017). As explained above, however, Gilbertson's constitutional rights were not violated. Thus, Romuld's official-capacity claims must be dismissed. *See, e.g., Whitney v. City of St. Louis*, 887 F.3d 857, 861 (8th Cir. 2018) ("[A]bsent a constitutional

violation by a city employee, there can be no § 1983 or Monell liability[.]"); *Quiñones v. City of Edina*, 77 F.4th 1192, 1196 (8th Cir. 2023) (affirming dismissal of *Monell* claims "for lack of a [constitutional] violation").

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein,

IT IS HEREBY ORDERED THAT:

1.   Defendant's motion for summary judgment [ECF No. 29] is GRANTED.

2.   Plaintiff's complaint [ECF No. 1] is DISMISSED WITH PREJUDICE AND ON THE MERITS.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  August 7, 2026                          /s/ Patrick J. Schiltz
                                                Patrick J. Schiltz
                                                United States District Judge